[Civil No. 3996. Filed June 27, 1938.]

[80 Pac. (2d) 689.]

LURA EGELSTON, Petitioner, v. THE INDUSTRIAL COMMISSION OF ARIZONA, Defendant Insurance Carrier, J. NEY MILES, SAM PROCTOR and L. C. HOLMES, as Members of the Industrial Commission of Arizona, and SEARS ROEBUCK & COMPANY, Defendant Employer, Respondents.

Mr. Burt H. Clingan, for Petitioner.

Mr. Don C. Babbitt and Mr. Howard A. Twitty, for Respondents.

LOCKWOOD, J. — Lura Egelston, hereinafter called petitioner, received an injury from an accident arising out of and in the course of her employment. She presented a claim to the Industrial Commission of Arizona, hereinafter called the commission, for compensation for such injury, and the commission on March 13, 1937 found she was temporarily disabled from September 20, 1936, to March 10, 1937, entitling her to compensation in the sum of $256.28, which was duly paid her but that the evidence was insufficient to establish that any disability which she might have suffered subsequent to March 10, 1937, was proximately the result of a compensable accident, and denied her

further compensation. Petitioner asked for, and was granted, a rehearing, at which time the award of March 13th was affirmed, and the matter was brought before us for review.

The injury for which petitioner received compensation was a blow on the front part of the head, caused by the falling of a cash carrier from a height of some twenty feet in the store in which she was employed. It is her contention that ever since such time, and for long after the commission denied her compensation, she has been, and is, in such a condition, as a result of the injury, that she is totally disabled from carrying on any gainful occupation. The finding of the commission is that, if such a condition exists, it is not due to the accident and injury resulting therefrom.

The question then is, whether petitioner has sustained the burden placed upon her by law of establishing that her present condition is the result of the injury. She has been examined by at least seven or eight highly skilled and reputable physicians in the city of Phoenix. They all agree that her objective physical condition, with possibly one exception to which we shall refer hereafter, is practically normal so far as can be determined by any and all of the known medical tests. They also agree that if her statement of her subjective condition is a correct one, that she is totally disabled from work. With one exception, all of the physicians are of the opinion that her present condition, assuming it to exist as she states it is, is purely psychogenic in its origin. Some of them are of the opinion that it is entirely disassociated from the traumatic accident above referred to. Others are of the opinion that it is indirectly caused by the accident. As expressed by one of the physicians who holds this view:

"This woman suffered an injury and about the same time was in a highly nervous state due to family diffi-

culties and in my opinion this has brought on what might be a nervous break-down, the injury being merely the fuse which set off the dynamite. In my opinion the entire symptoms complained of are psychogenic in origin.''

One alone of all the examining physicians, Dr. Saxe, found any objective physical condition which would indicate that her subjective symptoms were the result of the traumatic injury. He stated that he caused an encephalogram to be made of her brain, and that he was of the opinion therefrom,

'' . . . there was a slight deviation of the left ventricle toward the right side, with more encroachment of the roof or the vault on the left side than on the right,''

and stated in view of the history of the case he believed that her subjective symptoms were caused by the displacement above referred to, which in its turn was probably the result of the traumatic injury. He also stated that with the history of the trauma and her statements in regard to her symptoms before him, aside from the encephalogram, he would be inclined to think the trauma had some bearing at least on her condition and was sufficient to account for it. The encephalogram taken by the witness was submitted to Dr. Watkins of the medical rating board, who is one of the state's leading specialists in roentgenology, and he made the following report:

''Following the removal of spinal fluid an introduction of 60 cc. of air. Air covers the surface of the brain, but not sufficiently to separate brain density from cranium, sulci are plainly shown. Ventricles are outlined by symmetrical shadows of normal appearance. Communicating pathways are evidently patent. No abnormal findings.''

Thereafter his attention was called to the encephalogram again in the following language:

"Dr. Saxe would like to have Dr. Watkins look at the encephalogram again. He thinks there is a very slight but definite deviation of the left ventricle toward the right side, with more encroachment of the roof (vault) on the left side than on the right."

To which he replied:

"Too slight for me to be definite about it, when ventricles are probably not fully distended with aid."

Dr. Saxe thereafter suggested to the commission, in the following language, that another encephalogram be taken:

"Attached is a report of an x-ray reading on your former claimant, Mrs. Lura Egelston. One may infer that the present encephalogram is not satisfactory for definite conclusion to be reached; therefore, I request that the Commission authorize me to repeat the procedure at the expense of the Commission."

But this offer was declined by the commission.

The legal proposition upon which petitioner claims that the award should be set aside is the same as that stated by the respondent in the case of *Phelps Dodge Corp.* v. *Industrial Com.*, 46 Ariz. 162, 49 Pac. (2d) 391, in the following language (pages 165, 166):

" 'When as the approximate result of an accidental personal injury sustained by an employee, arising out of and in the course of his employment, such employee, after all objective and subjective symptoms of actual physical injury are removed, suffers from a nervous breakdown, and a neurasthenic condition ensues, attributable to such injury, which precludes the employee from resuming his work in his former occupation, such mental condition is an injury arising out of and in the course of his employment and is compensable under the provisions of the Arizona Workmen's Compensation Law.' "

We approved this general proposition of law, but pointed out the *quantum* of proof necessary to sustain it in the following language (pp. 168, 169):

"We are not questioning the correctness of respondent's legal proposition but, on the contrary, think it states the law. The only difficulty in applying it here is that it does not fit the facts as found by the commission. If the commission had found that respondent's neurosis was caused by an injury sustained in the accident of March 26th, or if the evidence had shown such to be the case, then the award would have been proper. The plain language of our statute makes it imperative that the disease be the result of an injury.

"While the commission in its findings did not so state, the only conclusion to be drawn therefrom is that the commission believed respondent's neurosis was not induced by any personal injury he suffered but by a deep-set fear or apprehension of imaginary ailments that might follow as a result of his injury and the deplorable condition in which his family might be left. There was medical testimony to sustain such a conclusion. Whether this be a correct conclusion or not, it is not necessary to determine. There being no finding that the respondent's neurosis was the result of an injury, he must necessarily fail, as our statute makes that indispensably necessary to entitle him to compensation for disease."

It will be seen by a reference to the evidence herein that there was testimony which would sustain the conclusion that the present subjective condition of the petitioner was due to a psychogenesis resulting from a combination of two causes—a highly nervous temperament, and the traumatic accident, the latter being, in the language of one of the witnesses, "the fuse which set off the dynamite." If such is the fact, petitioner would be entitled to compensation so long as the result of the explosion actually continued, and was not feigned. On the other hand, several of the physicians stated that in their opinion the accident in no way produced the psychogenic condition under which they believed petitioner is laboring.

Counsel for petitioner in his oral argument admitted that were it not for one thing, under our oft-repeated rule the finding of the commission would be binding upon us, but he contends certain evidence appears in the record which should cause a setting aside of the award. One of the expert witnesses took an encephalogram of the petitioner's brain and stated positively that he found therein a definite deviation of the left ventricle toward the right side with more encroachment of the roof on the left side than on the right, and that such a physical condition would produce all of the subjective conditions which petitioner complained of. There is no claim on the part of any of the other expert witnesses that should such a physical condition actually exist it would not produce such conditions. But the only other expert to whom the encephalogram was submitted stated in substance, although not in exact language, that the encephalogram was apparently not taken under conditions which would make a definite diagnosis possible, and that therefore he could not confirm the findings of the expert who took it. It was the contention of petitioner's counsel that Dr. Watkins had assumed that the encephalogram was taken under conditions which, as a matter of fact, did not exist, and that if he had been informed of the true conditions it is possible that his opinion would have agreed with that of Dr. Saxe, and that because of such fact, the award is not sustained by the evidence, or at least that the commission should have permitted Dr. Saxe to take another encephalogram for submission to Dr. Watkins. It does not seem likely that if Dr. Watkins had been informed that 120 cc. of air had been used, instead of 60 cc., his opinion would have been changed. It was on what he actually saw that he made his diagnosis. The knowledge that more air was used than he had thought could not have changed the appearance of the encephalogram. Only

a new encephalogram of different appearance could reasonably have been anticipated to have had any effect.

 It is of course true that the commission in the making of an award is acting in a judicial capacity, and it is its duty to receive and consider any and all evidence available which will assist in determining whether or not a petitioner is entitled to compensation. *Doby* v. *Miami Trust Co.*, 39 Ariz. 228, 5 Pac. (2d) 187. If, therefore, the commission had refused to consider competent evidence bearing on the question it would have been reversible error, and if Dr. Saxe had submitted another encephalogram for Dr. Watkins' consideration, the commission should have considered it, and secured a reading thereof from Dr. Watkins. But we have also held that it is the duty of a claimant to present evidence to the commission which will sustain the burden of proof which the law places upon him, and that the commission is under no obligation of procuring and paying for expert medical testimony merely because, in the opinion of petitioner, it might throw further light on the case. *Bochat* v. *Prescott Lumber Co.*, 51 Ariz. 97, 74 Pac. (2d) 575. In the present case, the request for and offer of another encephalogram was predicated upon the commission paying the bill therefor. We think under these circumstances it was not error for it to refuse to have another made.

 This is evidently one of the border-line cases, so hard to determine from a medical standpoint, and with so sharp a conflict in the testimony we do not feel that we would be justified, following our oft-repeated rule, in setting aside the award merely because it might be that other triers of fact would have come to a different conclusion upon the evidence.

The award is affirmed.

McALISTER, C. J., and ROSS, J., concur.